1

2

3

4                          UNITED STATES DISTRICT COURT

5                               DISTRICT OF NEVADA

6                                      * * *

7    UNITED STATES OF AMERICA,                    Case No. 2:08-cr-00164-KJD-GWF
                                                            2:17-CV-0751-KJD
8                                Plaintiff,
                                                           ORDER
9           v.

10   STEVEN GOLDEN,

11                              Defendant.

12          Presently before the Court is Defendant's Motion to Vacate, Set Aside, or Correct

13   Sentence under § 2255 (#370). The Government filed a response in opposition (#378) to which

14   Defendant replied (#381). The parties also filed multiple supplements

15   (#386/387/396/400/419/423/425). Also, before the Court is Defendant's Emergency Motion for

16   Decision Due to Covid-19 Pandemic (#427).

17   I. Background

18          This case arose out of a Bureau of Alcohol Tobacco and Firearms ("ATF") undercover

19   operation in a tattoo shop. In September 2007, ATF opened the undercover storefront operation

20   in Las Vegas. See Trial Transcript, ECF No. 264 (2/16/10 trial tr.) at 33-34. As criminals came

21   into the business, a functioning tattoo shop, the agents would identify particularly dangerous

22   individuals—those involved, for example, in residential burglaries and armed robberies—and

23   propose to them a dangerous criminal opportunity. Id. at 38-39. An undercover agent posing as a

24   disgruntled drug courier would tell the targets about a stash house containing a large quantity of

25   cocaine. Id. at 38; ECF No. 261 (2/17/10 trial tr.) at 16. The agent would propose that the target

26   rob the stash house, steal the drugs, and split the proceeds with him. ECF No. 264 at 38. ATF

27   Special Agent Peter McCarthy assumed the undercover role of the tattoo shop owner. Id. at 32,

28   34.

1    In February 2008, a confidential informant introduced McCarthy to co-conspirator and

2   ringleader Deonte Reed. Id. at 36. Reed sold McCarthy a loaded, .25-caliber pistol, and said he

3   could get more. Id. at 36-37. Based on his conversations with Reed and on information he had

4   obtained that Reed was involved in a series of residential burglaries and had been arrested for

5   conspiracy to commit armed robbery, McCarthy decided to approach Reed with the "stash

6   house" robbery story. ECF No. 264, at 39-40.

7    On April 17, 2008, Reed came to the tattoo shop to meet with McCarthy. Id. at 41-42. Of

8   his own initiative, Reed brought Defendant Spentz and another man with him. Id. at 42-44.

9   McCarthy brought the men into his small back office and introduced them to ATF Special Agent

10   Richard Zayas, who played the undercover role of the disgruntled drug courier. Id. at 40-42.

11   While waiting for Zayas to arrive, McCarthy told Reed and his friends that whether they decided

12   to work with Zayas or not was up to them. Id. at 48-49.

13    Zayas first told the men that he was going to explain the situation to them, and that if they

14   were not interested, everyone could go their own way as if they had never met. ECF No. 261 at

15   16. Zayas said he worked as a courier for a Mexican drug organization, but that he was upset

16   because he was being underpaid, and he wanted to steal their cocaine. Id. at 28. Zayas said when

17   he arrives at the stash house to collect the six to seven kilograms of cocaine that he delivers,

18   there are always two men in the house, one of whom always has a gun. Id. at 21. He said the

19   armed man stays with him, while the other man goes into a room in the back of the house to get

20   Zayas's delivery. Id. at 21. Zayas also said that he always sees a large amount of cocaine—

21   between 22 and 39 kilograms—packaged in bricks on a table in the front room of the house. Id.

22   at 21-22. Zayas said the location of the stash house changes, and that he does not know the

23   address until the drug traffickers call him right before he goes to pick up his delivery. Id. at 22.

24    After explaining the scenario, Zayas asked whether this was something Reed could

25   handle. Id. at 32. Reed said that he could handle it and proceeded to formulate the plan of how he

26   would commit the robbery. Id. at 33-35. Reed said they would lay Zayas and the other men on

27   the floor and steal the cocaine, id. at 35, and that if the other men "make a false move, it's our

28   turn to go and do what we got to do." Reed said, "we got the utilities to take care of it," and told

1    Zayas he had a "burner with a silencer." Id. at 35, 41. Reed reiterated that they would "beat [the

2    drug dealers'] ass[es]... and if they make false moves, we do what we got to do." Gov't Exh. 2A.

3    Throughout the conversation, Spentz sat on a couch next to Reed, saying nothing; he did not

4    react or act surprised when Reed emphasized that they would beat the drug dealer's asses and

5    they would "do what we got to do" if they made a false move.

6         The meeting ended with Zayas and Reed agreeing to get together in person around May

7    12, when Zayas said he would learn the date of the next drug delivery. Reed called McCarthy on

8    May 8 to confirm that the plan was still on. ECF No. 264, at 52-53. Zayas met with Reed again

9    on May 12 and met with Reed and co-conspirator Jackson on May 14. Id. at 56-57; ECF No.

10   264, at 57-58, 61. At the meeting on the 14th, Reed agreed to meet Zayas with his co-

11   conspirators the next day to commit the robbery. ECF No. 264 at 76-77.

12        The next day, Reed and his three co-defendants (Jackson, Spentz and Golden), arrived at

13   the Ice House parking lot as planned. ECF No. 264 at 81. Reed and Jackson arrived in a red

14   Chevy Blazer, followed by Spentz and Golden in a white Nissan. Id. Zayas, McCarthy, and

15   Agent Gomez (who had been playing the undercover role as McCarthy's sidekick), huddled with

16   the defendants. ECF No. 264 at 81, 86, 91-92. Zayas asked Reed whether he had explained to

17   Spentz and Golden that one of the two men at the stash house was armed; Reed said he had. ECF

18   No. 261 at 54.

19        Zayas explained the entire scenario again, and asked "is that cool?" ECF No. 264 at 92.

20   Reed responded "That's cool," and Golden said "yeah," and Spentz nodded affirmatively. ECF

21   No. 264 at 92-93. The agents told the defendants that the rental vans were waiting at a nearby

22   location, and the agents and the defendants drove in tandem to that location. ECF No. 264 at 93.

23        When they arrived at the warehouse and exited their cars, Zayas gave the predetermined

24   signal, and an ATF tactical team moved in and arrested the defendants. ECF No. 261 at 64- 65.

25   Agents recovered a Glock semiautomatic pistol with an extended magazine loaded with 32

26   rounds, in the Nissan; and a Taurus PT145 semiautomatic pistol, loaded with eight .45- caliber

27   hollow-point rounds, in the center console of Reed's Chevy Blazer. Id. at 7-79, 84-86.

28

1    II. Procedural Background

2          On December 17, 2019, a jury convicted Spentz and Golden (co-conspirator Reed was

3    tried separately) of conspiracy to commit Hobbs Act robbery (Count One), conspiracy to possess

4    with the intent to distribute cocaine (Count Two) ("the drug trafficking conspiracy") and

5    possessing, aiding and abetting possession of  a firearm in furtherance of either the drug

6    trafficking conspiracy or the Hobbs Act conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A)

7    (Count Three). On April 12, 2010, the Court sentenced Golden to 192 months custody: 132

8    months on Count One, 132 months on Count 2 concurrent, and a consecutive 60 months on

9    Count Three.

10         Golden filed a court-authorized successive section 2255 motion in 2016, seeking relief

11   based on the Supreme Court's June 2015 decision in Johnson v. United States, 135 S. Ct. 2551,

12   2557 (2015), which held that the residual clause in the definition of a "violent felony" in the

13   Armed Career Criminal Act of 1984, 18 U.S.C. § 924(e)(2)(B) ("ACCA"), is unconstitutionally

14   vague. Golden argued, among other things, that Johnson's holding also invalidated the "residual

15   clause" in the definition of "crime of violence" in 18 U.S.C. § 924(c)(3)(B), and that the

16   conspiracy to commit Hobbs Act robbery offense that served as one of the predicates for his

17   section 924(c) conviction did not qualify as a crime of violence.

18         The government responded that Golden did not meet the requirements for successive §

19   2255 motions; and that Johnson did not invalidate section 924(c)(3)(B). ECF No. 377. Although

20   the government was correct that Johnson did not invalidate section 924(c)(3)(B)—a conclusion

21   the Ninth Circuit later confirmed, see United States v. Blackstone, 903 F.3d 1020 (9th Cir.

22   2018)—the Supreme Court's more recent decision in United States v. Davis, 139 S. Ct. 2319

23   (2019), did. The government agrees with Golden  that, as a matter of judicial efficiency, the

24   Court should decide the present motion on its merits (after considering the parties' arguments in

25   the supplemental pleadings), rather than dismissing the present motion as untimely and requiring

26   Golden to start over with a section 2255 motion based on Davis. The Court agrees.

27   III. Analysis

28         Essentially, Defendant contends that his § 924(c) conviction for using a firearm during

- 4 -

1    and in relation to a crime of violence is void because the "crime of violence" element is not

2    satisfied.  The parties agree that conspiracy to commit Hobbs Act robbery no longer qualifies as

3    a crime of violence after <u>Davis</u>. Therefore, unless Golden's conviction for conspiracy to possess

4    with the intent to distribute cocaine (Count Two) is enough to satisfy the requirements of §

5    924(c), the Court must vacate Defendant's conviction on Count Three and resentence Defendant

6    without the sixty (60) month consecutive sentence.

7         With respect to Count Three, the Court instructed the jury—without objection—that it

8    could convict Golden if it found beyond a reasonable doubt that he or a co-conspirator possessed

9    a firearm during and in relation to either the Hobbs Act conspiracy *or* the drug trafficking

10   conspiracy. ECF 132, p. 19-22. Now that the residual clause of § 924(c) is invalid, Golden

11   argues that the conviction on Count Three is invalid, because the jury issued a general verdict

12   that did not specify which of the conspiracies the jury relied on when finding him guilty of Count

13   Three. <u>See</u> <u>Zant v. Stephens</u>, 462 U.S. 862, 881 (1983) (<u>Stromberg</u> requires that a general verdict

14   must be set aside if the jury was instructed that it could rely on any two grounds, and one of the

15   grounds is insufficient, because the verdict may have rested exclusively on the insufficient

16   ground).

17        <u>Hedgpeth v. Pulido</u>, 555 U.S. 57, 58 (2008), agrees that a conviction based on a general

18   verdict is subject to challenge if the jury was instructed on alternative theories and may have

19   relied on an invalid one However, it also instructs that such errors are subject to harmless error

20   review. <u>Id.</u> at 60. In fact, errors to which harmless error analysis does not apply are the exception

21   and not the rule. <u>Id.</u>at 61.

22        The error is subject to the harmless error standard set for the in <u>Brecht v. Abrahamson</u>,

23   507 U.S. 619, 623 (1993), under which the reviewing court asks whether the flaw (in this case

24   the inclusion of the conspiracy to commit Hobbs Act robbery as a predicate offense for the

25   924(c) violation) in the instruction "had a substantial and injurious effect or influence in

26   determining the jury's verdict." The proper harmless error standard is defined by <u>Neder v. United</u>

27   <u>States</u>, 527 U.S. 1, 7-8 (1999). <u>See</u> <u>Hedgpeth</u>, 555 U.S. at 18. The Court must determine whether

28   it was "clear beyond a reasonable doubt that a rational jury would have found the defendant

1    guilty absent the error." <u>Neder</u>, 527 U.S. at 7-8. Therefore, the Court must conduct a thorough

2    examination of the record to determine "whether the record contains evidence that could

3    rationally lead to a contrary finding with respect" to the error. <u>Id.</u> at 19.

4         Here, the evidence clearly shows that the robbery conspiracy is inextricably intertwined

5    with the drug trafficking conspiracy. The conspiracy had one goal: steal the cocaine and resell it.

6    This was a one-time event. The guns at issue were not used in a string of robberies but were

7    stolen or purchased without background checks and used for one purpose, to facilitate the theft of

8    the cocaine. The jury was properly instructed on the elements of the drug trafficking conspiracy

9    and the jury found Golden unanimously guilty of the charged drug trafficking conspiracy. There

10   were no notes from the jury evincing confusion about the jury instructions or what elements were

11   necessary to convict on the drug trafficking conspiracy.

12        In this case, the two predicate crimes were co-extensive. It is not a case where, for

13   example, defendant was convicted of two robberies committed at different times and places and

14   the 924(c) count was predicated on both robberies. In that case, the jury's general verdict on the

15   924(c) count would not mean it necessarily found the defendant possessed the firearm during and

16   in relation to both robberies. Because the present conspiracies were co-extensive, both limited in

17   time, location and scope, the Court cannot conclude that the instructional error led the jury to

18   convict based solely on the invalid predicate (conspiracy to commit Hobbs Act robbery). In fact,

19   based on the evidence and the conviction based on the drug trafficking conspiracy, no rational

20   fact finder could have found Defendant's conviction for the 924(c) violation was based solely on

21   the conspiracy to commit Hobbs Act robbery. This is not a case where the Court "is in grave

22   doubt as to the harmlessness of an error that affects substantial rights." <u>O'Neal v. McAninch</u>, 513

23   U.S. 432, 445 (1995) (citing <u>Kotteakos v. United States</u>, 328 U.S. 750, 764-65 (1946)).

24   Accordingly, Movant's petition is denied.

25   <u>IV. Conclusion</u>

26        Accordingly, IT IS HEREBY ORDERED that Defendant's Motion to Vacate, Set Aside,

27   or Correct Sentence under § 2255 (#370) is **DENIED**;

28        IT IS FURTHER ORDERED that Defendant's Emergency Motion for Decision Due to

1    Covid-19 Pandemic (#427) is **DENIED as moot.**

2    Dated this 30th day of September 2020.

3

4

5    _____

     Kent J. Dawson

6    United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 7 -